**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 23-4070**

―――――――――

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SEDDRICK DAMOND BANKS,

Defendant - Appellant.

―――――――――

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg. Thomas S. Kleeh, Chief District Judge. (1:18-cr-00050-TSK-MJA-3)

―――――――――

Submitted: December 3, 2024          Decided: February 18, 2025

―――――――――

Before HARRIS and QUATTLEBAUM, Circuit Judges, and TRAXLER, Senior Circuit Judge.

―――――――――

Affirmed by unpublished per curiam opinion.

―――――――――

**ON BRIEF:** Frank C. Walker II, FRANK WALKER LAW, Clairton, Pennsylvania, for Appellant. William Ihlenfeld, United States Attorney, Brandon S. Flower, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.

―――――――――

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Sedrick Banks was convicted by a jury of six drugs- and weapons-related offenses, including conspiracy to distribute controlled substances and being an accessory after the fact to distribution of fentanyl resulting in death. The district court sentenced Banks to 600 months' imprisonment. Banks appeals. Finding no reversible error, we affirm.

I.

As established by the government's evidence at trial, Terrick Robinson led a drug-trafficking organization known as the "Georgia Boys." Other members of the group included Joel Jiminez, William Chappell, and Banks. Beginning in the spring of 2018 through early September 2018, Robinson and some combination of the others traveled from Cartersville, Georgia, to West Virginia on a weekly basis to sell wholesale quantities of methamphetamine, cocaine, and fentanyl. They typically arrived on Monday and then returned to Georgia on Thursday or Friday. The group generally stayed in motels, although there was a short period when they operated out of a house owned by one of their customers. Banks—who is Robinson's half-brother, J.A. *see* 1983-84—was initially part of the group traveling to West Virginia; he carried a gun and was involved in distributing the drugs. Robinson, however, became concerned that Banks was "too flashy" and drew too much attention, J.A. 1580, and he replaced Banks with Chappell. Jimenez joined the group sometime in the summer of 2018. *See* J.A. 1583, 1588-92, 1684, 1688, 1777-84.

During the week of August 6, 2018, Robinson, Chappell, and Jimenez were operating out of a room at the Days Inn in Jane Lew, West Virginia, selling their usual assortment of drugs and a new addition—"china white," which Robinson sold as "pure"

2

heroin. J.A. 1944. On August 7, Rebecca Larch, one of Robinson's customers, asked about the china white, telling Robinson in text messages that it was "kill ya strong." J.A. 1944. She told Robinson that she believed it had "fetty in it" because she had "a couple friends fall out already. Had to stick ice down their pants . . . ." J.A. 1944. Robinson agreed that the china white was strong and told Larch that "I don't even want to sell it any more myself it's crazy I had some body fall out on me too." J.A. 1946. On August 8, Larch returned to the motel to trade the china white for the "beige" heroin she usually bought. J.A. 1947 ("'The beige though is good high quality get ya high not die.'").

On August 9, 2018, Robinson brought 20-year-old Courtney Dubois to the Days Inn to party with the Georgia Boys. Late in the evening, after the group had returned from dinner, Robinson cut a line of china white for Dubois. Within a few minutes, Dubois had collapsed on the bed and was unresponsive. Chappell unsuccessfully tried to revive her by placing ice under her arms, and the group began to panic. Robinson directed Jimenez and Chappell to take the drugs and money and get a new room. They drove to Flatwoods, West Virginia, and checked into a motel, where they stashed the drugs and money. A couple of hours later, Jimenez and Chappell returned to the Days Inn in Jane Lew. Dubois was still unresponsive, and Chappell left to obtain Narcan from a friend of Robinson's. They placed Dubois in the bathtub in cold water and administered Narcan but could not revive her. At no point did any member of the group call 911 or seek medical attention for Dubois. *See* J.A. 1622-33, 1788-92.

After the Narcan failed, Robinson directed Jimenez and Chappell to go to Walmart to get gasoline and a shovel. Jimenez told Robinson they would do that, but instead he and

3

Chappell returned to the Flatwoods motel room, flushed the drugs, split the money, and headed back home to Georgia. *See* J.A. 1633-36, 1793-94.

When Robinson realized that Jimenez and Chappell were not coming back, he contacted Banks, who was in Georgia. Banks arrived in Jane Lew just after midnight on Saturday, August 11. He took a picture of Dubois' body in the bathtub, and he and Robinson loaded her body into a car and drove back to Georgia, arriving before 11 a.m. Robinson and Banks bought Tyvek coveralls from their hometown Lowe's, and Robinson used a chainsaw to dismember Dubois' body. They placed the body parts in seven separate garbage bags, placed her clothes in another bag, and disposed of them all at the local dump. Dubois' body was discovered on Monday by attendants at a county landfill, where the container from the dump had been transferred. Video subsequently obtained from a security camera at a nearby store showed two men get out of a black truck with tinted windows and silver running boards and make multiple trips to dump multiple garbage bags. *See* J.A. 2042, 2046.

Robinson called and texted Chappell and Jiminez multiple times as they were on the run back to Georgia, asking where they were and where his drugs and money were. After Robinson returned to Georgia, he confronted Jimenez about abandoning him in Jane Lew, and he demanded to know what had happened to the drugs and money they had taken to the other motel. *See* J.A. 1794-1799. Robinson told Jimenez that "they had cut her up" using a chainsaw, J.A. 1795, but Robinson did not identify the person who assisted him. Robinson also confronted Chappell about what happened in Jane Lew, but did not say anything about disposing of Dubois' body.

4

After Dubois' death, Chappell and Jimenez stopped working for Robinson, *see* J.A. 1595-96, 1800; Robinson told a customer that he "fired" Jimenez and Chappell because "they don't know how to conduct business." J.A. 1488. Robinson brought Banks back in and continued on with his West Virginia operation. *See* J.A. 1488, 1489, 1650-51. Robinson eventually let Chappell back in so he could work off the debt from the money and drugs lost after Dubois' death. *See* J.A. 1652-53.

The Georgia Boys were unaware that a West Virginia drug task force had been investigating them for several months. By August 2018, the hotel room out of which the group was operating had been identified and was under surveillance. Meanwhile, Georgia law enforcement officials had connected the Georgia Boys to Dubois' dismembered corpse.[1] They contacted the West Virginia drug task force, and the officers began collaborating on the investigation.

On August 23, 2018, the investigators in West Virginia used a confidential informant to make a controlled buy from the Georgia Boys. Banks was present during the transaction. On September 4, 2018, the investigators used the CI to make another controlled buy. The CI went to Room 202 of the Red Roof Inn in White Hall, West Virginia, and paid Robinson $5,500 for one pound of methamphetamine. Robinson left the room after the sale. After the CI returned with the drugs he got from Robinson, the investigators obtained

---

[1]    After hearing news of the discovery of Dubois' corpse, an apparently remorseful Jimenez voluntarily spoke to Georgia law enforcement officials about the Georgia Boys' activities in West Virginia. He provided them with his phone and showed them the texts from Robinson after Dubois' overdose. *See* J.A. 1798-99.

warrants authorizing a search of the motel room and the arrest of Robinson. The warrants were executed essentially simultaneously—Robinson was arrested in his car, away from the motel, as other officers were entering the motel room. Inside the room were Banks, Chappell, and a customer looking to buy heroin from Robinson. Banks was on the floor near the bathroom; there was a large amount of methamphetamine in the toilet, and Banks' 9mm Glock was in the bathtub.

Banks was arrested that day on an outstanding fugitive-from-justice warrant from Georgia. He waived extradition and was subsequently returned to Georgia to face the pending state charges. *See* J.A. 178-79, S.A. 11, 14, 23, 43-44.

Items recovered during the search of the motel room included three cellphones, two handguns, methamphetamine, cocaine, and the money from the controlled purchase. The next day, a motel housekeeper found a bag of white powder in the room that turned out to be fentanyl.

The phones recovered during the searches of the motel room and Robinson's car included two phones used by Robinson and one used by Banks. The phones contained a wealth of incriminating evidence, including texts from Robinson to Banks after Dubois' death giving Banks the address of the motel in Jane Lew and the cost of tolls on Interstate 77 on his way into West Virginia, and texts from Banks to his girlfriend at 2:30 a.m. on August 11, telling her that he was in West Virginia. *See* J.A. 1961-63, 1986-87. GPS location data from the phones showed Banks on August 10 travelling north and arriving in Jane Lew around midnight, and Banks and Robinson both returning home to Georgia on the morning of August 11, *see* J.A. 1829-32, 1838-41, 2063.

6

Robinson's phone showed internet searches about whether fingerprints could be recovered from garbage bags, and the internet history for both phones included news stories and searches about the discovery of Dubois' dismembered body. *See* J.A. 1966-69, 2033-36. Banks' phone contained pictures of Dubois in the bathtub at the motel in Jane Lew taken at 12:39 a.m. on August 11, *see* J.A. 1989, 1992, and pictures of a person wearing a blood-splattered Tyvek jumpsuit, standing in front of a black pickup truck with tinted windows and silver running boards, *see* J.A. 1990, 1995-96, 2042, 2046-47. GPS data also showed that Robinson's phone was in the vicinity of the Lowe's store at the time two Tyvek jumpsuits of the same type shown in the pictures were being purchased, *see* J.A. 1996-2001, and that Robinson's and Banks' phones were near the dump at the time that Dubois' body was placed there, *see* J.A. 1833-34, 2043.

Banks, Robinson, and Chappell were indicted by a federal grand jury on October 3, 2018. On March 19, 2019, the grand jury returned a superseding indictment that added Jimenez as a defendant. Banks was charged with six counts in the superseding indictment—one count charging conspiracy to distribute controlled substances, *see* 21 U.S.C. §§ 841, 846; three counts charging possession with intent to distribute, *see* 21 U.S.C. § 841; one count charging the using and carrying of a firearm during a drug trafficking offense, *see* 18 U.S.C. § 924(c)(1)(A); and one count charging Banks as an accessory after the fact to the distribution of fentanyl resulting in death, *see* 18 U.S.C. § 3. J.A. 67-79.

When both the original indictment and the superseding indictment were returned, Banks was in custody in Georgia, awaiting trial on state felony and misdemeanor charges.

7

On October 22, 2019, the government filed a Petition for Writ of Habeas Corpus Ad Prosequendum, requesting Banks' appearance before the United States Magistrate Judge on November 20, 2019. Counsel was appointed for Banks, and Banks made his initial appearance and was arraigned on the superseding indictment on November 20, 2019.

Counsel for Banks moved to dismiss the indictment on Speedy-Trial grounds. After the district court denied the motion, counsel moved for a continuance. Counsel argued that because he had just entered the case, he could not be prepared for the trial that was then scheduled to begin in January 2020. Concerned about the effect of a continuance on Robinson's Speedy-Trial rights, the district court *sua sponte* severed Banks from the indictment for trial purposes and granted his motion to continue.

Robinson's trial began on January 7, 2020, with Chappell and Jimenez testifying against him. The jury found Robinson guilty on all counts. The district court sentenced him to life imprisonment, and this court affirmed his convictions and sentence. *See United States v. Robinson*, 55 F.4th 390 (4th Cir. 2022).

After severance was granted, the case against Banks proceeded slowly, in part because of the logistical difficulties created by the COVID-19 pandemic. In addition, Banks filed several motions related to his contention that venue should be changed because of pre-trial publicity about the crime and Robinson's trial. Banks' trial ultimately began on June 28, 2021. As noted, the jury found Banks guilty on all counts, and the district court sentenced Banks to 600 months' imprisonment. This appeal followed.

II.

8

Banks raises numerous issues on appeal. He contends the district court erred by: (1) denying his motion to change venue; (2) denying his motion to dismiss because of violations of his right to a speedy trial; (3) overruling Banks' for-cause challenges to certain jurors; (4) denying his motion for a mistrial; (5) overruling his objections to certain trial testimony; (6) overruling his objection to a comment made by the government during closing argument; and (7) denying his motion for judgment of acquittal.

## A. Change of Venue

Banks contends that the pre-trial publicity about his case, including the coverage of Robinson's trial and conviction, was inherently prejudicial and required the district court to transfer venue. When considering a motion to transfer based on pretrial publicity, we must "consider first whether pretrial publicity was so extreme as to give rise to a presumption of prejudice." *United States v. Taylor*, 942 F.3d 205, 223 (4th Cir. 2019). If there is no presumption of prejudice, the court must then consider whether the publicity caused the defendant actual prejudice. *See id.; see also* Fed. R. Crim. P. 21(a) ("Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.").

The district court reviewed Banks' motion and concluded that the press coverage was factual and not "sensationalized or editorialized in any way," J.A. 296, and that a presumption of prejudice was not warranted. The district court nonetheless permitted Banks to hire an expert to perform additional research and survey the potential jury pool for exposure to coverage about the case. The expert's report showed that 35% of survey

9

respondents had heard about the body of a West Virginia woman being discovered in Georgia; 16% were familiar with the victim's name; and 8% recognized Banks' name. *See* Supp. J.A. 248.

While the record establishes the existence of pre-trial coverage of the crime and Robinson's trial, "juror exposure to news accounts of the crime alone" is not sufficient to trigger a presumption of prejudice. *Skilling v. United States*, 561 U.S. 358, 380 (2010) (cleaned up). "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*. A presumption of prejudice . . . attends only the extreme case." *Id.* at 381. The media coverage in this case was factual and not pervasive. Because this was not an extreme case, the district court did not err by denying Banks' motion to transfer. *See Taylor*, 942 F.3d at 222 ("[J]uror exposure to media coverage cannot by itself establish that a defendant was deprived of a fair trial, even if the publicity was pervasive, adverse, and voluminous.").

## B. Speedy Trial

Banks next contends that he was deprived of his constitutional right to a speedy trial. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."). He argues that he was prejudiced by the lengthy delay between his federal indictment in September 2018 and his trial in June 2021, and that the charges against him should therefore have been dismissed.[2] We disagree.

---

[2] Despite his insistence to the contrary, Banks was not arrested on *federal* charges on September 4, 2018. Instead, as established by the record and explained by the district court, Banks was taken into custody that day on *state* charges, based on an (Continued)

10

When determining whether a delay in bringing a defendant to trial violates the Sixth Amendment,

> a reviewing court must [first] decide whether the length of the delay triggers a speedy trial inquiry. In that respect, the Court has suggested that we should conduct a full inquiry when such a delay approaches one year. Second, a reviewing court must weigh the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.

*United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009) (cleaned up). If the inquiry proceeds, the court should consider "(1) the 'length of the delay'; (2) 'the reason for the delay'; (3) 'the defendant's assertion of his right'; and (4) the 'prejudice to the defendant.'" *Robinson*, 55 F.4th at 399 (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). To prevail, Banks must show "that on balance, the four separate factors weigh in his favor." *Hall*, 551 F.3d at 271 (cleaned up).

---

outstanding fugitive arrest warrant issued by the State of Georgia. Banks was indicted by a federal grand jury in September 2018, but he remained in state custody in Georgia until November 20, 2019, when he appeared before a United States Magistrate Judge in West Virginia as required by the Petition for Writ of Habeas Corpus Ad Prosequendum filed by the government on October 22, 2019. Before the magistrate judge, Banks was arraigned on the federal charges and ordered to be detained in federal custody pending trial. Thus, despite being under federal indictment since September 2018, Banks was not *arrested* on the federal charges until November 20, 2019.

The date of Banks' federal arrest has no special relevance to his Sixth-Amendment speedy-trial claim, which focuses on *indictment*, not arrest. *See, e.g., United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009) ("By definition, the constitutional right to a speedy trial is triggered by an indictment. . . ."). The date of his arrest is relevant, however, to Banks' claim that Rule 5 was violated. *See* Fed. R. Crim. P. 5(a)(1)(A) ("A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge . . . ."). Because Banks made his initial appearance on the same day he was arrested, the Rule 5 claim is without merit.

11

As to the length of the delay, Banks was indicted in September 2018 and tried in June 2021. The relevant period for purposes of our inquiry is shorter, however, given that the delays after December 17, 2019, were at the request of Banks and are not asserted in his brief as a basis for his Sixth Amendment claim. Nonetheless, as the government concedes, even this shorter period of fifteen months is a significant delay that requires a full speedy-trial inquiry. *See id.* ("[W]e should conduct a full inquiry when such a delay approaches one year").

Under our precedent, the fifteen-month delay here is presumptively prejudicial, and the first factor therefore favors Banks. Nonetheless, the *reason* for the delay in this case is "valid" and weighs in favor of the government. *Robinson*, 55 F.4th at 400. As we explained when Robinson appealed his convictions,

> Because the government was awaiting Georgia's prosecution of Banks, the reason for delay weighs in its favor. It's immaterial whether . . . the government had the ability to secure Banks's appearance and set a trial date. The need to allow a defendant to be prosecuted by the State without interference by the federal government is an obvious reason to delay federal proceedings.

*Id.* (cleaned up).[3]

---

[3]      We reject Banks' claim that his time in state custody was a "ruse" to circumvent the protections of the Sixth Amendment. The record establishes that Banks was arrested on a fugitive warrant that was issued by Georgia in August 2018, based on criminal conduct that occurred in March 2018. *See* Supp. J.A. 15-19. Banks' unsupported insistence that his arrest on a pre-existing state warrant was a ruse is not evidence of collusion between state and federal officials, and the district court did not err by rejecting Banks' claim. *See, e.g., United States v. Rodriguez-Amaya*, 521 F.3d 437, 441–42 (4th Cir. 2008) ("The requirements of the [Speedy Trial] Act would lose all meaning if federal criminal authorities could collude with civil or state officials to have those authorities detain a defendant pending federal criminal charges solely for the purpose of bypassing the (Continued)

Because Banks raised the speedy-trial issue shortly after the appointment of counsel for the federal charges, we will assume the third factor weighs in his favor. The final factor—prejudice—clearly weighs against Banks. As the Supreme Court has explained, prejudice

> should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*Barker*, 407 U.S. at 532 (cleaned up). Banks does not address the first two interests, and as to the third simply asserts that the delay prevented him "from identifying any alibis he may have had and prevented him [from] properly preparing for this case." Brief of Appellant at 19-20. Banks does not "provide a single example of something relevant to his case that he or another witness couldn't remember," *Robinson*, 55 F.4th at 400, or otherwise explain how a delay in the trial prevented him from knowing whether he had an alibi. This claim of "generalized prejudice common to all cases and all delays" is insufficient to tip the fourth factor to Banks' favor. *Id.*

Thus, although the length of the delay and the timely assertion of his right point in favor of Banks, his trial was delayed because of a clearly valid reason, and Banks suffered

---

requirements of the Speedy Trial Act. *If a court found evidence of such collusion*, the provisions of the Act could be applied to state or civil detentions.") (cleaned up) (emphasis added).

13

no cognizable prejudice attributable to the delay. The district court therefore properly denied Banks' speedy-trial motion.

## C. Juror Strikes

Banks contends the district court erred by rejecting his for-cause challenges to eleven specific jurors. Banks argues that the challenged jurors either expressed improper beliefs about a defendant's right or obligation to testify or had improper "personal ties to cases involving the same subject matter" as Banks' cases, Brief of Appellant at 26, such as friends or family members who work in law enforcement, or friends and family who have been affected by drugs and addiction. This argument is without merit.

"[A] district judge retains a very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *United States v. Turner*, 389 F.3d 111, 115 (4th Cir. 2004) (cleaned up). "[A] district court abuses its discretion if it ignores a per se rule of disqualification" or "demonstrates a clear disregard for the actual bias of an individual venireman." *Id.* (cleaned up).

Our cases recognize a limited number of per-se disqualifications from jury service, for good reason.

> Under our system it is the trial judge who is best situated to determine competency to serve impartially. Per se rules of disqualification interfere with the trial court's administration of jury selection. Trials courts are expert at finding and applying facts, particularly in the conduct of a trial. Per se rules, by contrast, create situations in which no set of facts can allow the judge to utilize this expertise and discretion. This inverts our deferential standard of review. A list of per se exclusions would burden the courts needlessly with a responsibility of endless speculation on the presumptive bias of potential jurors.

14

*Id.* (cleaned up). We have previously recognized that there is no *per-se* rule of disqualification of jurors with family connections to law enforcement or of jurors with a relative who was a victim of a crime similar to the defendant's, *see United States v. Umana*, 750 F.3d 320, 341-42 (4th Cir. 2014); *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990), and that same reasoning precludes any suggestion that jurors with family members affected by substance abuse and addiction are *per se* disqualified from cases involving drugs.

As to the question of actual bias, the district court's jury selection process was thorough and careful. The court asked the jurors about their connection to law enforcement and whether they had friends or family members affected by drug abuse. The court explained the presumption of innocence, the defendant's right to remain silent, and the government's burden to prove the defendant's guilt beyond a reasonable doubt. All of the jurors now challenged by Banks agreed on the record that they could follow the law and make a decision on the evidence presented at trial, and that they could be fair and impartial. The district court therefore did not abuse its discretion when it refused to strike the challenged jurors for cause.

## D. Mistrial

During trial, one of the government's law-enforcement witnesses testified that Banks was arrested on an outstanding warrant. Counsel for Banks immediately objected and moved for a mistrial. The district court sustained the objection and instructed the jury to disregard that testimony, but the court declined to order a mistrial. *See* J.A. 892-94. Banks contends on appeal that the district court erred by denying a mistrial. Banks argues

15

that the mention of the warrant was highly prejudicial "because it presupposes there is prior criminal activity," which would "predispose[ the jury] to a ruling of guilt." Brief of Appellant at 28. We disagree.

"In our system of justice, the law does not allow consideration of other crimes as evidence of a defendant's criminal disposition. But that does not mean that any reference to an uncharged offense, no matter how brief and attenuated it may be, compels a mistrial." *United States v. Hunt*, 99 F.4th 161, 192-93 (4th Cir. 2024) (cleaned up). In this case, there was a single, brief reference to the outstanding warrant; the warrant was not central to the government's case; the court immediately gave a curative instruction; and the evidence against Banks—including the pictures and text messages on his cell phone—was overwhelming. Under these circumstances, the district court did not abuse its discretion by denying the motion for mistrial. *See id.* at 192 ("We review a district court's decision on a motion for mistrial for abuse of discretion, and we reverse only in the most extraordinary of circumstances.") (cleaned up); *United States v. Hart*, 91 F.4th 732, 745 (4th Cir. 2024) (district court did not abuse its discretion by denying a mistrial because of witness's statement that the defendant had previously been in jail because the statement was brief, the court instructed the jury to disregard the statement, and the evidence against the defendant was overwhelming); *United States v. Johnson*, 114 F.3d 435, 444 (4th Cir. 1997) ("The jury is generally presumed to be able to follow an instruction to disregard evidence, absent some strong indication that the evidence is so powerful that a jury could not ignore it and that the defendant would be harmed as a result.") (cleaned up).

E. Hearsay

16

Banks contends the district court erred by permitting DEA Agent Purkey to testify about statements made by Jimenez to law enforcement officials in Georgia. Banks argues that the evidence was admitted under the co-conspirator exception to the rule against hearsay, *see* Fed. R. Evid. 801(d)(2)(E), and that evidence was insufficient to show the existence of a conspiracy. We disagree.

As the government argues, Purkey's testimony about the statements was not offered for the truth of the matter asserted in the statements, but to explain why Purkey took certain steps in the investigation. The statements therefore were not hearsay, and the district court did not err by permitting the testimony. *See* Fed. R. Evid. 801(c)(2) (to qualify as hearsay, the challenged statement must be "offer[ed] in evidence to prove the truth of the matter asserted in the statement"); *United States v. Davis*, 918 F.3d 397, 401 (4th Cir. 2019) ("[T]he testimony was offered not for the truth of whether the Informant had in fact purchased methamphetamine from Davis on prior occasions, but rather as an explanation— or a motive—for the officers' using the Informant in setting up the controlled buy. In these circumstances, the testimony was not even hearsay barred by Federal Rule of Evidence 802 . . . ."); *United States v. Love*, 767 F.2d 1052, 1063 (4th Cir. 1985) ("[A]n out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken.").

### F. Closing Argument

In closing argument, counsel for Banks contended that Banks was not involved in the drug-distribution conspiracy but was merely present during some transactions, and counsel pointed to other people who could have been the person who traveled to West

17

Virginia to help Robinson dispose of Dubois' body. In rebuttal, the government argued that the jury should ask itself, "what would an innocent person do?" J.A. 2251-52 ("What would an innocent person do? Ask yourself that. An innocent person might call the police, 9-1-1. An innocent person might even walk away. . . . I don't want to be part of this. How did she die? If you are an innocent person, let's get her help. Let's get her to her family."). The government returned to this point repeatedly in its rebuttal argument. *See* J.A. 2252, 2255, 2257, 2261. Banks contends the argument was improper and deprived him of a fair trial, because the rhetorical questions asked the jury "to put them[selves] in the shoes of a party to litigation." Brief of Appellant at 32. We disagree.

"Great latitude is accorded counsel in presenting closing arguments to a jury, but the guiding principle is that a prosecutor should not strike foul blows." *United States v. Webb*, 965 F.3d 262, 267 (4th Cir. 2020) (cleaned up). When considering whether comments made by a prosecutor during closing warrant reversal, we must determine "(1) whether the argument was improper, and if so, (2) whether it so prejudicially impacted the defendant's substantial rights as to deprive him of a fair trial." *Id.*

In this case, our analysis stops at the first step. The government's rhetorical questions about how an innocent person would behave did not ask the jury to stand in the shoes of the defendant or anyone else, nor did they amount to a comment on Banks' right to remain silent, and the argument, therefore, was not improper. *See United States v. Lara,* 23 F.4th 459, 480 (5th Cir. 2022) ("An attorney is entitled to urge the conclusions which the attorney thinks the jury should draw from the evidence. In doing so, the Government may utilize rhetorical questions that are inferential in substance.") (cleaned up); *United*

18

*States v. Hall*, 625 F.3d 673, 685 (10th Cir. 2010) (concluding that it was "within the limits of proper argument" for the prosecutor to suggest in closing argument how an innocent person would behave); *United States v. Williams*, 445 F.3d 724, 737 (4th Cir. 2006) (prosecutor's argument in closing that "an innocent man would protest when being accused of killing someone" was not an improper comment on the defendant's failure to testify at trial) (cleaned up).

## G. Sufficiency of the Evidence

Finally, Banks contends that the government's evidence was insufficient and that the district court therefore erred by denying his motion for judgment of acquittal.

The denial of a motion for judgment of acquittal is reviewed de novo. *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018). A verdict of guilt must be upheld if, "viewing the evidence in the light most favorable to the government, it is supported by substantial evidence, which is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (cleaned up). When considering Banks' challenge, "we must remain cognizant of the fact that the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (cleaned up).

Viewed in the light most favorable to the government, we conclude that the evidence presented at trial was more than sufficient to sustain the guilty verdict. Co-conspirators Chappell and Jimenez testified about Banks' activities and his role in the

19

group. Text messages on Banks' phone from June 2018 show him answering requests from two customers with specifics about the drugs available and the prices. *See* J.A. 2036-38.

Moreover, Banks was present at the controlled buys conducted on August 23 and September 4, 2018. When the officers entered the motel room to execute the search warrant, they found Banks on the floor near the bathroom, flushing away the evidence. Evidence from Banks' phone included text messages showing his involvement in arranging drug deals and his travel to West Virginia after Dubois overdosed, along with the pictures of Dubois in the bathtub in West Virginia and the blood-splattered Tyvek suit in Georgia. From this evidence, a rational jury could find Banks guilty of each of the charges against him. The district court therefore properly denied Banks' motion for a judgment of acquittal.

III.

For the foregoing reasons, we find no error by the district court and affirm Banks' convictions and sentence.

*AFFIRMED*