**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-4231**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MARTIN L. HUNT, a/k/a O.G. Martin,

Defendant – Appellant.

---

**No. 21-4300**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DESHAUN RICHARDSON, a/k/a Day Day,

Defendant – Appellant.

—————————

**No. 21-4334**

—————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ERIC NIXON, a/k/a Young Nix, a/k/a Lil Nix,

Defendant – Appellant.

—————————

**No. 21-4349**

—————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

XAVIER GREENE, a/k/a BJ,

Defendant – Appellant.

—————————

**No. 21-4355**

—————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

RAYMOND PALMER, a/k/a Ray Dog,

Defendant – Appellant.

_____

**No. 21-4358**
_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

RYAN TAYBRON, a/k/a 22, a/k/a Ryan Savage,

        Defendant – Appellant.

_____

**No. 21-4509**
_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

GEOVANNI DOUGLAS, a/k/a Geo, a/k/a Twin,

        Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Mark S. Davis, Chief District Judge. (4:17-cr-00052-MSD-RJK-1; 4:17-cr-00052-MSD-RJK-6; 4:17-cr-00052-MSD-RJK-8; 4:17-cr-00052-MSD-RJK-5; 4:17-cr-00052-MSD-RJK-10; 4:17-cr-00052-MSD-RJK-7; 4:17-cr-00052-MSD-RJK-9)

_____

Argued: January 23, 2024                      Decided: April 16, 2024

_____

Before HEYTENS and BENJAMIN, Circuit Judges, and MOTZ, Senior Circuit Judge.

_____

Affirmed by published opinion.  Senior Judge Motz wrote the opinion, in which Judge Heytens and Judge Benjamin joined.

_____

**ARGUED:**  Rhonda Elizabeth Quagliana, MICHIEHAMLETT, PLLC, Charlottesville, Virginia; Kimberly Harvey Albro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina; Jenny R. Thoma, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellants.  Brian James Samuels, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.  **ON BRIEF:**  Lawrence H. Woodward, Jr., RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT & WOODWARD, P.C., Virginia Beach, Virginia, for Appellant Martin L. Hunt.  Gerald T. Zerkin, Richmond, Virginia, for Appellant Xavier Greene.  Brendan S. Leary, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Wheeling, West Virginia, for Appellant Ryan Taybron.  Jamison P. Rasberry, RASBERRY LAW, P.C., Virginia Beach, Virginia, for Appellant Raymond Palmer.  Nicholas R. Hobbs, SCHEMPF & WARE, PLLC, Yorktown, Virginia, for Appellant Eric Nixon.  Daymen W. X. Robinson, LAW OFFICE OF DAYMEN W. X. ROBINSON, PC, Norfolk, Virginia, for Appellant Geovanni Douglas. Jessica D. Aber, United States Attorney, Richmond, Virginia, Daniel J. Honold, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

4

DIANA GRIBBON MOTZ, Senior Circuit Judge:

This appeal arises from the prosecution of the "36th Street Bang Squad" (the "Bang Squad"), a gang that committed a string of murders, attempted murders, and assaults in 2015 and 2017. The United States charged seven of the gang's members — Martin Hunt, Deshaun Richardson, Eric Nixon, Xavier Greene, Raymond Palmer, Ryan Taybron, and Geovanni Douglas (collectively, "Defendants") — with racketeering conspiracy, murder, attempted murder, and related crimes. Following a five-week trial, the jury returned guilty verdicts on nearly every count. Defendants now appeal, raising a host of issues, including but not limited to challenges to (1) the classification of their racketeering offenses as crimes of violence; (2) the denial of their motions to exclude testimony of three forensic experts; and (3) the denial of their motions for judgment of acquittal and for a mistrial. After careful review of a voluminous record, we find no reversible error, and so affirm.

I.

In 2019, a grand jury returned the operative 35-count second superseding indictment against Hunt, Richardson, Nixon, Greene, Palmer, Taybron, and Douglas. This indictment alleged a single count of conspiracy to commit racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); multiple murders and attempted murders in violation of the Violent Crimes in Aid of Racketeering Act ("VICAR"); seventeen corresponding firearm offenses, 18 U.S.C. § 924; and other crimes including witness intimidation, narcotics distribution, and false statements.

5

During the five-week jury trial that followed, the Government marshaled a mountain of evidence to support these charges, including physical evidence, social media records, and surveillance footage. The Government also produced the testimony of three forensic experts connecting the defendants' firearms to the scenes of multiple assaults, murders, and attempted murders. And the Government offered the testimony of more than 50 fact witnesses, including six cooperating Bang Squad members: Jarrell Atkins, Jamaree Green, Corey Sweetenburg, Eric Edmunds, Akeem Robinson, and Shaquone Ford. This evidence painted a vivid portrait of multiple gang-related murders, shootings, and other violent crimes committed by the Bang Squad in 2015 and 2017.

A.

Count 1 charged all seven defendants with conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d). This count alleged that the defendants participated in the 36th Street Bang Squad, a criminal enterprise, and agreed to support this enterprise through a pattern of racketeering offenses — including murder, robbery, witness intimidation, and drug distribution. The jury convicted all seven defendants on this count.

The 36th Street Bang Squad operated in Newport News and Hampton, Virginia. The Bang Squad saw itself as a "brotherhood," with violence as its currency and its creed. Its members committed robberies, murders, and shootings to establish themselves in the gang. They traded in guns and cars, and shared the fruits of their crimes. They were expected to "put in work," and earned reputation in the gang by committing violent acts. And they used violence to protect their territory, exert their influence, and retaliate against

6

their foes.  In a practice known as "op shopping" (opposition shopping), members of the Bang Squad would hunt members of rival gangs, and shoot them on sight.

Taybron led the gang and planned its operations.  The Bang Squad worked out of the Marshall Courts and Seven Oaks apartments in Newport News, and Taybron's home in Hampton.  The Bang Squad warred with five rival street gangs — the Walker Village Murder Gang, the Newsome Park Gang, the 44th Street Gang, the 9th Street Gang, and the Chestnut Gang.  And the Bang Squad used social media to enflame conflicts with its rivals. Its members used Facebook to coordinate activities, stake territorial claims, and taunt their adversaries, often by disseminating posts and music videos boasting about violent, retaliatory acts.  These actions escalated tensions among the gangs, and often sparked violent conflict.

B.

The Government offered evidence that the Bang Squad committed multiple crimes in the spring of 2015.  On March 8, 2015, Bang Squad members Xavier Greene and Steven Harris went hunting for "ops."  At the corner of Ivy Street and 9th Street, in Newport News, they shot and killed 18-year-old Dwayne Parker, a member of the rival Newsome Park Gang.  Greene and Harris fled the scene, and engaged in a "shootout" with members of the 9th Street Gang, who were leaving a house party.  Greene and Harris took shelter in the home of Jarrell Atkins, another Bang Squad member, and posted a video of Parker's dead body on social media.  The jury convicted Greene of VICAR murder (Count 2), and a related firearm charge (Count 3), for his role in this offense.

7

Only one week later, on March 15, 2015, Martin Hunt and Lionel Harris went "op shopping," and shot at a member of the Walker Village Murder Gang on Wickham Avenue. Philip Drew and Arthur Jones, both minors, were struck in the crossfire. Jones sustained gunshot wounds to the head and the back; Drew was shot in the ankle, the forearm, the buttock, and the mouth. Both survived, and were treated at the Riverside Regional Medical Center. The jury convicted Hunt of two counts of VICAR attempted murder (Counts 30, 32), and two corresponding firearm charges (Counts 31, 33), for his role in these crimes.

The Walker Village Murder Gang swiftly retaliated. On April 6, 2015, Walker Village member Domingo Davis shot at Hunt and Harris. That same day, four Bang Squad members left the Marshall Courts apartment complex to search for Davis. The Bang Squad members spotted Davis leaving a party on 25th Street and opened fire, killing both Davis and 13-year-old Jada Richardson. The Government charged Richardson, Greene, and Hunt with two counts of VICAR murder (Counts 6, 8), and two associated firearm crimes (Counts 7, 9) for this double murder. The jury convicted Greene and Hunt of all four counts, but acquitted Richardson of these offenses.

That same night, Dwayne Dozier, of the Newsome Park Gang, shot up the residence of Jamaree Green, a Bang Squad member, while his family was inside. Green asked Hunt to help him retaliate, but Hunt urged him to wait, as police activity was "too hot" following the Jada/Richardson double murder. About a week later, when Bang Squad members stated on social media that they had spotted Dozier, Taybron told them to "pop" him; two hours later, Richardson asked why they had not. Then, on April 27, Green, Palmer, Atkins, and Sweetenburg drove to Dozier's home late at night, and fired multiple rounds into the house

8

while Dozier's mother was inside. For his role in this shooting, the jury convicted Palmer of one count of VICAR attempted assault with a deadly weapon (Count 10), and a related firearm charge (Count 11).

C.

The summer of 2015 saw more violent, gang-related criminal activity. On June 3, 2015, Newsome Park gangster Jeremiah Smith murdered Bang Squad member Kevonne Turner in his front yard, sparking another chain of retaliatory shootings. A member of the Bang Squad saw the shooting, pursued Smith, and shot at him near an H&H convenience store. The Government charged Geovanni Douglas with one count of VICAR attempted murder (Count 34) and a corresponding firearm charge (Count 35) for this offense, but the jury acquitted him of both counts.

After Smith's escape, the Bang Squad embarked on a protracted effort to locate him. On June 5, 2015, Taybron's girlfriend, Yamasha Jones, spotted Smith at his high school, Bridgeport Academy. Taybron mobilized two cars full of Bang Squad members to kill Smith — including Martin Hunt and several other unnamed gang members. An extended pursuit followed. The Bang Squad drove to the school, and followed Smith's school bus to the Derby Run Apartments. As Bang Squad members combed the apartments to search for Smith, they ran into two Walker Village gangsters outside a nearby Sonic restaurant, and opened fire from their vehicle. The jury convicted Hunt of VICAR attempted murder and conspiracy to commit murder (Count 12), and a corresponding firearm charge (Count 13), for these crimes.

9

On August 1, 2015, several Newsome Park members "jumped" two Bang Squad members inside a Solo Mart at 4710 Madison Avenue, in Newport News. Kierra Mitchell, a friend of the gang members, called for backup. Xavier Greene, who was staying across the street, gave his firearm to Geovanni Douglas, who ran to the Solo Mart and fired at the assailants. Jasmine Person, who was shopping for cigarettes inside, was caught in the crossfire. She was struck in the neck and the finger, and rushed by ambulance to the Riverside Regional Medical Center. The Government charged Greene and Douglas with VICAR attempted murder (Count 14), and a corresponding firearm charge (Count 15), for this offense. The jury convicted both defendants of the attempted murder, but convicted only Douglas of the firearm charge.

This chain of violence continued throughout the rest of 2015. Later in August, Greene led a burglary of Southern Police Equipment, a gun shop near Richmond, to "arm his brothers." In September, Taybron learned that his girlfriend, Yamasha Jones, was interacting with rival gang members, so he ordered a nighttime shooting of her house. Sweetenburg and Ford pled guilty to this shooting. And in November, a rival gang killed Steven Harris in retaliation for his role in the string of shootings the previous summer.

## D.

Two additional clashes occurred in early 2017. On January 2, 2017, Ford picked up Taybron and Nixon to drive them to Taybron's house. As the trio passed through the Chestnut Gang's territory, they spotted some Chestnut Gang members standing outside a convenience store. Taybron ordered Ford to pull over, and they confronted the Chestnut gangsters, ultimately sparking a shootout. The Government charged Taybron and Nixon

10

with VICAR attempted murder (Count 21) and a related firearm count (Count 22), for this offense. At trial, Taybron and Nixon requested and received a self-defense instruction, but the jury nonetheless convicted them of both crimes.

One month later, on February 9, 2017, Nixon instructed Shaquone Mercer to buy him a gun from a pawn shop. Two weeks after that, Nixon caught Darrell Pittman, of the Newsome Park gang, leaving Aqueduct Apartments, and shot him in the head. Nixon boasted about this shooting to other Bang Squad members, and posted on Facebook that Pittman was "on the ground flopping like a fish." Pittman survived, was hospitalized, and identified Nixon as the shooter. Two days later, officers arrested Nixon and Jamaree Green in a hotel room. For his actions, the jury convicted Nixon of VICAR attempted murder (Count 23), a corresponding firearm charge (Count 24), and one count of making false statements during a firearm purchase (Count 25).

## II.

The jury deliberated for several days, and then, as detailed above, returned guilty verdicts against all seven defendants, on most of the counts alleged in the indictment.[1] Defendants filed motions for judgment of acquittal, which the district court denied in a

---

[1] In addition to the acquittals discussed above, certain counts were not submitted to the jury. Before trial, the Government dismissed Counts 16–19, alleging another shooting, and Count 20, alleging witness tampering in relation to that shooting. Moreover, before submitting its case, the prosecution dismissed Count 28, and dismissed Richardson from Counts 25–27, alleging narcotics activities.

series of lengthy orders. They also filed motions for a new trial, which the court denied in a consolidated order.

The district court sentenced Martin Hunt to three consecutive life sentences and 120 months' imprisonment; Deshaun Richardson to 204 months' imprisonment; Eric Nixon to 360 months' imprisonment; Xavier Greene to four consecutive life sentences; Ryan Taybron to 360 months' imprisonment; Raymond Palmer to 180 months' imprisonment; and Giovanni Douglas to 228 months' imprisonment. The defendants timely appealed. We now turn to the numerous issues raised on appeal.

## III.

First, Defendants Hunt, Nixon, Greene, Palmer, Taybron, and Douglas challenge their convictions under 18 U.S.C. § 924(c), arguing that their predicate convictions under Violent Crimes in Aid of Racketeering Act ("VICAR"), 18 U.S.C. § 1959, do not constitute crimes of violence, as defined in § 924(c)(3). We consider de novo a contention that an offense does not constitute a crime of violence. *United States v. McNeal*, 818 F.3d 141, 151 (4th Cir. 2016).

The VICAR statute addresses "the particular danger posed by those who are willing to commit violent crimes in order to bolster their positions within racketeering enterprises." *United States v. Keene*, 955 F.3d 391, 394 (4th Cir. 2020) (cleaned up). Under VICAR, it is a crime to commit one of several enumerated offenses to gain entrance into, or to "maintain or increase [one's] position in," a racketeering enterprise. *Id.* (cleaned up); *see also* 18 U.S.C. § 1959(a). Here, the Government charged each murder, attempted murder,

12

conspiracy to commit murder, and attempted assault as a VICAR offense, because the Bang Squad committed each crime as part of its organized efforts to exert its influence, protect its territory, and retaliate against its rivals.

Defendants contend that neither VICAR attempted murder based on Virginia attempted murder, nor VICAR attempted assault with a dangerous weapon based on Virginia unlawful wounding, constitute valid predicates for their § 924(c) convictions. They rely on the Supreme Court's recent decision in *Taylor v. United States*, 596 U.S. 845 (2022), to so argue. In considering their arguments, we first examine how the Supreme Court's opinion in *Taylor* affects our analysis of attempt offenses under § 924(c). We then turn to the application of that analysis to Defendants' VICAR offenses.[2]

A.

"Pursuant to 18 U.S.C. § 924(c)(1)(A), it is a crime to use, carry, or possess a firearm 'during and in relation to any crime of violence.'" *United States v. Simmons*, 11 F.4th 239, 253 (4th Cir. 2021). We employ the categorical approach to evaluate whether an offense is a crime of violence under this provision. *United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019). To constitute a crime of violence, a predicate offense must have as an element "the use, attempted use, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc); 18 U.S.C. § 924(a)(3)(A). We "consider only the

---

[2] A VICAR offense is a crime of violence if either the state law predicate or the generic federal offense is a crime of violence. *United States v. Thomas*, 87 F.4th 267, 274–75 (4th Cir. 2023); *United States v. Manley*, 52 F.4th 143, 147 (4th Cir. 2022). Because we hold that both Virginia predicate offenses constitute crimes of violence under § 924(c)'s force clause, we need not evaluate the generic federal offenses.

crime as defined, not the particular facts of the case," and our analysis "begins and ends with the offense's elements." *Simms*, 914 F.3d at 233. The term "physical force" requires "violent force — that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (cleaned up). And to constitute a crime of violence, the offense must require a mens rea more culpable than recklessness. *See United States v. Jackson*, 32 F.4th 278, 283 (4th Cir. 2022).

Because § 924(c) reaches crimes that require the "attempted use" of violent physical force, prior to *Taylor*, most circuits held that any attempt to commit a crime of violence is invariably a crime of violence. *See, e.g.*, *United States v. Walker*, 990 F.3d 316, 328 (3d Cir. 2021); *United States v. Smith*, 957 F.3d 590, 595 (5th Cir. 2020); *United States v. Ingram*, 947 F.3d 1021, 1026 (7th Cir. 2020); *United States v. Dominguez*, 954 F.3d 1251, 1261 (9th Cir. 2020); *United States v. St. Hubert*, 909 F.3d 335, 351 (11th Cir. 2018). But, in the opinion underlying *Taylor*, we departed from that consensus, reasoning that certain crimes of violence "can be accomplished merely through the threatened use of force," and that "an attempt to *threaten* force does not constitute an attempt to *use* force." *United States v. Taylor*, 979 F.3d 203, 209 (4th Cir. 2020), *aff'd*, 596 U.S. 845 (2022). Our decision in *Taylor* created a split with our sister circuits, and the Supreme Court promptly took up the case.

In *Taylor*, the Supreme Court addressed whether attempted Hobbs Act robbery is a crime of violence under § 924(c). 596 U.S. at 850. The completed offense of Hobbs Act robbery requires an unlawful taking of property "by means of actual or threatened force." *Id.* (quoting 18 U.S.C. § 1951(a)). Because a completed Hobbs Act robbery is a crime of

14

violence, the Government argued that an attempt to commit this offense must be a crime of violence as well. *Id.* at 853. The Supreme Court rejected that approach, just as we had — holding that the attempt must itself involve actual, attempted, or threatened force. *Id.* The Court explained that because Hobbs Act robbery can be completed with "actual *or* threatened force," an attempt to commit that offense by conveying a threat might not involve "attempted force." *Id.* at 852. By way of example, the Court discussed a would-be robber who researched a store, bought equipment, drafted a threatening note, and was arrested as he stepped into the building. *Id.* at 851–52. That hypothetical defendant did not use force, attempt to use force, or threaten anyone. *Id.* at 852. Instead, he attempted to convey a threat of physical force — sufficient for attempted Hobbs Act robbery, but not for § 924(c). *Id.*

The thrust of *Taylor* is that an attempt offense qualifies as a crime of violence only if the completed offense invariably requires the use of physical force. As we explained in the decision underlying *Taylor*:

> [W]here a crime of violence may be committed without the use or attempted use of physical force, an attempt to commit that crime falls outside the purview of the force clause. But where a crime of violence requires the use of physical force — as is usually the case — the categorical approach produces the opposite outcome: because the substantive crime of violence invariably involves the use of force, the corresponding attempt to commit that crime necessarily involves the attempted use of force.

979 F.3d at 208. That explanation remains accurate following the Supreme Court's holding in *Taylor*. An attempt offense is not a crime of violence merely because the completed offense is itself a crime of violence. But if a crime cannot be completed without the use of

15

physical force, any attempt to commit that crime necessarily requires the attempted use of physical force.

Defendants urge a broader reading of *Taylor*, under which an attempt crime cannot be a crime of violence if it may be completed through a nonviolent step towards the offense. They argue that a defendant "who intended to try to use force but never got the chance," such as where "their intended target was unavailable," has not attempted to use force at all. Repl. Br. 19. As we understand it, this argument would have us hold that § 924(c) defines the *attempted* use of force as the *unsuccessful* use of force. Under this reading, an attempt offense would only qualify as a crime of violence if it categorically requires an act that sets force in motion — such as pointing a gun and pulling the trigger. That construction is far more restrictive than the proper understanding of a criminal attempt, and would reduce the "attempted use" clause to a near nullity.

To start, this construction would read all attempt crimes out of § 924(c). At common law, an attempt consists of (1) a specific intent to commit the completed offense; and (2) a substantial step toward the offense that is strongly corroborative of the intent to commit it. *United States v. Resendiz-Ponce*, 549 U.S. 102, 106–07 (2007); *accord United States v. Haas*, 986 F.3d 467, 478 (4th Cir. 2021). But while a "substantial step" must be "more than mere preparation," *United States v. Engle*, 676 F.3d 405, 423 (4th Cir. 2012) (cleaned up), it "need not be the last possible act" before the completion of the offense, *United States v. Pratt*, 351 F.3d 131, 136 (4th Cir. 2003). And many probative but nonviolent acts, such as lying in wait, luring a victim, or gathering materials near the target area, can be a substantial step corroborative of the defendant's criminal intent. *Id.* at 135–

16

36 (quoting Model Penal Code § 5.01(2)).  Thus, if the phrase "attempted use of force" refers only to acts such as discharging a firearm, smashing a window, or swinging a knife, most — maybe all — attempt offenses would not be crimes of violence.  That cannot be what Congress intended.

Equally telling, remarkably few offenses have an element akin to the "unsuccessful use" of physical force.  *See United States v. States*, 72 F.4th 778, 786 (7th Cir. 2023) (reasoning that a construction of § 924(c) that excludes attempt crimes "would describe an empty set of offenses").  Section 924(c) requires a federal conviction as a predicate,[3] and "[f]ederal statutes seldom include attempted conduct as an element of a completed crime." *Id.*  While an isolated number of offenses have as an element the "attempt[] to cause bodily injury," they are the exception, not the rule.  *See id.* at 786–87 (citing 18 U.S.C. § 249(a)(1); 10 U.S.C. § 928(a)).  Against this backdrop, it is inconceivable that § 924(c) defines "attempted use . . . of physical force" in a way that "excludes the mine run of attempts to commit offenses that require the use of force," and "refers only to completed offenses that have attempted force as an element."  *Id.* at 787; *see Abramski v. United States*, 573 U.S. 169, 179 (2014) (instructing courts to examine "context, structure, history, and purpose," as well as "common sense," to interpret statutory language (cleaned up)).

Accordingly, we reject Defendants' construction of *Taylor*, which would exclude virtually all attempt offenses from the "attempted use . . . of physical force" under § 924(c).

---

[3] This case is no exception.  We reach the state-law predicates at issue in this appeal only by "look[ing] through" VICAR, which incorporates the charged state-law offense as an element.  *See Thomas*, 87 F.4th at 274–75.

17

Instead, we read *Taylor* to provide that an attempt is a crime of violence if the completed offense invariably requires the use of physical force. We now apply this construction to the Defendants' VICAR attempt offenses.

## B.

The jury convicted Defendants Hunt, Greene, Taybron, Nixon, and Douglas on nine § 924(c) counts arising from the Bang Squad's shootings of rival gang members and innocent bystanders. Six of these counts alleged discharge of a firearm in furtherance of a VICAR attempted murder (Counts 13, 15, 22, 24, 31, 33).[4] And each corresponding VICAR count was predicated on attempted first-degree murder in violation of Virginia law (Counts 12, 14, 21, 23, 30, 32). Citing *Taylor*, Defendants now argue that attempted murder is not a crime of violence under § 924(c). Because first-degree murder under Virginia law categorically requires physical force, their arguments fail.

Every circuit to consider whether attempted murder is a crime of violence following *Taylor* has held that this offense categorically requires the attempted use of physical force. *See, e.g.*, *United States v. Pastore*, 83 F.4th 113, 120 (2d Cir. 2023); *States*, 72 F.4th at 787–91; *Dorsey v. United States*, 76 F.4th 1277, 1284 (9th Cir. 2023); *Alvarado-Linares v. United States*, 44 F.4th 1334, 1346–48 (11th Cir. 2022). In *Pastore*, the Second Circuit reasoned that while Hobbs Act robbery may be committed by way of "threatened force," completed murder requires "the actual use of force." 83 F.4th at 121 (cleaned up).

_____

[4] The remaining three (Counts 3, 7, 9) alleged the use of a firearm resulting in death. The jury convicted Hunt and Greene of these crimes, and they do not appeal those convictions.

18

"Accordingly, a conviction for attempted murder categorically means that the defendant took a substantial step toward the use of physical force — and not just a substantial step toward the *threatened* use of physical force." *Id.* (cleaned up). And because "attempted murder requires both an intent to use physical force and a substantial step towards the use of physical force, it satisfies the 'attempted use . . . of physical force' element under section 924(c), and thereby qualifies as a crime of violence." *Id.* (cleaned up).

We agree. As discussed above, an attempt offense qualifies as a crime of violence if the completed offense categorically requires the use of physical force, and a *mens rea* more culpable than recklessness. "A conviction for first-degree murder under Virginia law requires the 'willful, deliberate, and premeditated' killing of another," and always involves "the use of force capable of causing physical pain to another person." *Mathis*, 932 F.3d at 265 (quoting Va. Code § 18.2-32); *accord In re Irby*, 858 F.3d 231, 238 (4th Cir. 2017). And in Virginia, a criminal attempt consists of: (1) a specific intent to commit the crime; and (2) "an overt act done towards its commission, but falling short of the execution of the ultimate design." *Commonwealth v. Herring*, 758 S.E.2d 225, 235 (Va. 2014). Because attempted murder requires the specific intent to kill, *Secret v. Commonwealth*, 819 S.E.2d 234, 248 (Va. 2018), and because it is impossible to commit intentional murder without the use of violent, physical force, *Mathis*, 932 F.3d at 265, attempted first-degree murder categorically involves the "attempted use . . . of physical force," 18 U.S.C. § 924(c)(3)(A). We therefore hold that the crime of attempted first-degree murder under Virginia law qualifies as a crime of violence for purposes of § 924(c). *See also United States v. Lassiter*, ___ F.4th ___, No. 22-4147 (4th Cir. 2024) (reaching same conclusion).

19

Two counterarguments merit attention. First, Defendants argue that attempted murder under Virginia law may be committed by an act as "slight" as knocking on the door to a person's home with the intention of killing him if he opened it. Hunt Br. 12–13, 58. *See Simmons*, 11 F.4th at 273–74 (quoting *Rogers v. Commonwealth*, 683 S.E.2d 311, 316 (Va. 2009)). Again, this argument wrongly urges us to read "attempted use . . . of physical force" much more narrowly than the proper understanding of a criminal attempt.[5] Nothing in the text of § 924(c)(3)(A) hints at such a strained reading. *States*, 72 F.4th at 786–87. And Defendants' example is not a "slight" act. A defendant who knocks on a victim's door with a gun in hand, and every intention to shoot, comes quite close to a completed murder. If he fails to kill the victim, he has "attempted" to use force in every reasonable sense — regardless of whether he fails because he shoots and misses, because his gun malfunctions, or because his target does not open the door.

Second, Defendants argue that Virginia first-degree murder may be committed by malicious omission, *Vaughan v. Commonwealth*, 376 S.E.2d 801, 806 (Va. 1989), and that crimes that can be completed by malicious omissions do not constitute crimes of violence. But we have held that "the knowing or intentional causation of bodily injury *necessarily*

---

[5] While Virginia law refers to an "overt act," and federal law requires a "substantial step," the two are similar in kind. "[A]n overt act is any 'act apparently adopted to produce the result intended' so long as that act is not 'mere preparation.'" *Herring*, 758 S.E.2d at 235–36 (quoting *Martin v. Commonwealth*, 81 S.E.2d 574, 576 (Va. 1954)). Like its federal counterpart, it need not be "the 'last proximate act to the consummation of the crime in contemplation.'" *Id.* at 235 (quoting *Glover v. Commonwealth*, 10 S.E. 420, 421 (Va. 1889)). *Cf. Pratt*, 351 F.3d at 136 (holding that a "substantial step" for federal attempted murder "need not be the last possible act" before the completion of the offense). Thus, Defendants' construction of *Taylor* would read Virginia attempts and federal attempts alike out of the force clause entirely.

involves the use of physical force."[6] *United States v. Rumley*, 952 F.3d 538, 549 (4th Cir. 2020) (quoting *United States v. Castleman*, 572 U.S. 157, 169 (2014)).  That is particularly so when "'death results' from the defendant's conduct."  *United States v. Roof*, 10 F.4th 314, 401 (4th Cir. 2021).  Because a defendant who commits an intentional murder inflicts "the greatest physical injury imaginable — death," *Jackson*, 32 F.4th at 287, we have already held that "first-degree murder under Virginia law" invariably requires the use of physical force, and "qualifies categorically as a crime of violence under the force clause," *Mathis*, 932 F.3d at 265; *accord Irby*, 858 F.3d at 237 ("Common sense dictates that murder is categorically a crime of violence under the force clause.").

## C.

The Government charged Palmer with a § 924(c) violation for the Dwayne Dozier home shooting (Count 11).  That charge relies on Count 10, VICAR attempted assault with a deadly weapon, which in turn rests on Virginia attempted unlawful wounding.  Palmer, too, relies on *Taylor* to argue that his state-law predicate offense is not a crime of violence.  His argument fails as well — we have previously held that Virginia unlawful wounding requires the use of physical force.  *See Manley*, 52 F.4th at 148 ("Not only does the Virginia

---

[6] Defendants argue that the holding in *Rumley* conflicts with two prior decisions holding that child abuse under Maryland law is not a crime of violence because it can be completed by omission.  *See United States v. Cabrera-Umanzor*, 728 F.3d 347, 352 (4th Cir. 2013); *United States v. Gomez*, 690 F.3d 194, 201 (4th Cir. 2012).  But *Gomez* held that "neither" affirmative acts nor omissions under Maryland's child abuse statute required physical force, 690 F.3d at 201, and *Cabrera-Umanzor* held that the same law was not a categorical match for the Guidelines definition of a "forcible sex offense" because it could be premised on a failure to prevent sexual abuse by a third party, 728 F.3d at 352 (citing U.S.S.G. § 2L1.2).  Neither case is on point here, where we address the implications of an attempt to commit murder.

21

statute require the causation of bodily injury, it also requires that the person causing the injury have acted with the specific intent to cause severe and permanent injury." (cleaned up)). It follows that any attempt to commit this offense categorically requires the attempted use of physical force, and qualifies as a crime of violence under § 924(c).

## IV.

Defendants next contest the denial of two pretrial motions: (1) their joint motion to exclude three forensic experts; and (2) Douglas's last-minute motion to reappoint counsel. We review both decisions for an abuse of discretion. *Simmons*, 11 F.4th at 261 (motion to exclude); *United States v. Perez*, 661 F.3d 189, 191 (4th Cir. 2011) (motion to substitute counsel). A district court abuses its discretion if (1) it applies the incorrect law; (2) it rests its decision on a clearly erroneous factual premise; or (3) we are left with the "definite and firm conviction" that it "committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Simmons*, 11 F.4th at 261 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

## A.

Federal Rule of Evidence 702 "imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (cleaned up); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). Expert testimony is relevant if it has "a valid scientific connection to the pertinent inquiry," and it is reliable only if it is "based

22

on scientific, technical, or other specialized knowledge" rather than raw "belief or speculation." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 959, 962 (4th Cir. 2020) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017)).

In performing this gatekeeping function, the district court must focus on the expert's "principles and methodology, not on the conclusions that they generate." *In re Lipitor Mktg., Sales Prac. & Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (cleaned up). The district court may consider a wide range of *Daubert* factors to evaluate an expert's methodology, including its error rate; the standards governing its operation; whether it can be tested; whether it is "subject to peer review"; and whether it is generally accepted in the relevant scientific or expert community. *United States v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *see Daubert*, 509 U.S. at 593–94. But these considerations are nonexclusive, and the court has "broad latitude" to account for "any factors bearing on validity that the court finds to be useful," *E.E.O.C. v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) (cleaned up), depending on "the nature of the issue, the expert's particular expertise, and the subject of his or her testimony," *McKiver*, 980 F.3d at 959 (cleaned up).

The Government relied on the testimony of three ballistics experts, Arnold Esposito, Julianna Red Leaf, and Alison Milam, to connect firearms shared by members of the Bang Squad to the scenes of each violent incident alleged in the indictment. As it must, the Government gave Defendants notice of these experts one month before trial. In response, Defendants filed a motion to exclude the testimony of all three experts, arguing that the field of "toolmark identification" — a forensic analysis technique that evaluates whether a particular gun fired a particular bullet — is categorically unreliable. The district court

23

denied this motion, observing that it had rejected identical arguments by the same attorneys in a recent case, and concluding that the Defendants' concerns spoke to weight, rather than admissibility.

Defendants renew their broad challenge on appeal, arguing that the entire field of forensic toolmark analysis fails to satisfy *Daubert*. They also urge us not to rely on the historic practice of admitting this evidence — arguing that, while toolmark analysis has been allowed for decades, growing scientific skepticism of this field warrants deeper scrutiny by the courts.

We recognize that the historic practice of admitting forensic evidence does not eliminate a trial court's responsibility to perform its gatekeeping function in a given case.[7] After all, "[s]erious deficiencies have been found in the forensic evidence used in criminal trials." *Melendez Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009). Testimony by forensic experts must be scrutinized under Rule 702 and *Daubert*, particularly if modern science has called the expert's principles and methods into question. *See id.* at 319–20. But the decision whether to permit forensic evidence in a given case, and whether to limit its use, remains firmly within the district court's "broad discretion." *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)); *see generally General Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).

---

[7] The district court cited its conclusions in a previous case to address Defendants' arguments on this issue. This might present a problem in another case. But as the district court observed, the previous case was argued by the same attorneys, who made identical arguments. In these circumstances, the district court did not abuse its discretion by relying on the prior decision.

Our role is to decide whether the district court abused that discretion, "not to determine the admissibility or inadmissibility of [firearm toolmark examination] for all cases." *United States v. Hunt*, 63 F.4th 1229, 1244 (10th Cir. 2023) (alteration in original) (quoting *United States v. Baines*, 573 F.3d 979, 989 (10th Cir. 2009)).

In exercising its discretion, the court may address concerns with expert testimony through less dramatic remedies than exclusion. Because *Daubert* analysis "is not intended to serve as a replacement for the adversary system, . . . the rejection of expert testimony is the exception rather than the rule." *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019) (cleaned up). Thus, even "shaky but admissible evidence" should be addressed through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not through "wholesale exclusion by the trial judge." *In re Lipitor*, 892 F.3d at 631 (cleaned up). That is equally true of forensic evidence. As the Supreme Court reasoned in *Melendez-Diaz*, while forensic sciences have faced increased scrutiny, "there is little reason to believe that confrontation will be useless in testing analysts' honesty, proficiency, and methodology — the features that are commonly the focus in the cross-examination of experts." 557 U.S. at 321.

The district court did not abuse its discretion in finding that Defendants' concerns with the reliability of forensic toolmark analysis could be addressed through confrontation, rather than exclusion. In the proceedings below, Defendants argued that toolmark analysis relies on subjective, ill-defined standards; that it may produce erroneous matches between guns from similar production batches; and that these uncertainties are vulnerable to bias. The district court addressed these concerns by instructing the Government not to overstate

25

the accuracy of its experts' conclusions,[8] and by advising Defendants to impeach them before the jury. And Defendants did exactly that, questioning each expert on the accuracy, reliability, and subjectivity of their methods. Because confrontation is the preferred vehicle for litigating these concerns, we cannot say that the district court abused its discretion by permitting Defendants to challenge these experts at trial, rather than keeping this evidence from the jury.

Defendants also argue that the court abused its discretion by denying their motion without holding a *Daubert* hearing. We disagree. "A trial court has 'considerable leeway in deciding in a particular case *how* to go about determining whether particular expert testimony is reliable.'" *McKiver*, 980 F.3d at 961 (quoting *Kumho Tire*, 526 U.S. at 152). As the district court noted, Defendants argued solely that forensic toolmark evidence is *categorically* inadmissible, and did not present any fact-specific challenge to the forensic experts who testified in this case. Because "the district court had sufficient information" to address Defendants' categorical argument, "the district court here was entitled to rely on the parties' materials without requiring further submissions or a *Daubert* hearing." *Id.*

---

[8] Defendants note that Juliana Red Leaf testified on cross that she has a "zero" error rate, and has never made an "incorrect identification or elimination." But because Defendants did not object to this testimony, we review it only for plain error. *See United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014). Given the mountain of corroborating evidence and the passing nature of this assertion, we conclude that Red Leaf's remark had no effect on Defendants' substantial rights. *See Greer v. United States*, 593 U.S. 503, 507–08 (2021).

B.

In addition to Defendants' challenge to the denial of their motion *in limine*, Douglas challenges the denial of his motion to reappoint counsel. "[T]he Sixth Amendment protects a defendant's 'right to counsel at all critical stages of the criminal process.'" *United States v. Cohen*, 888 F.3d 667, 681 (4th Cir. 2018) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013)). That safeguard includes a concomitant right "to voluntarily and intelligently elect to proceed without counsel." *Id.* (citing *Faretta v. California*, 442 U.S. 806, 807 (1975)). But once a defendant has foregone representation, "the right to counsel is no longer unqualified." *Id.* (cleaned up). Should a *pro se* defendant reassert his right to counsel, the court may consider (1) "the defendant's motive in seeking to rescind his pro se status"; (2) "the timeliness of [the] renewed request for counsel;" and (3) the balance of the defendant's interests and "the countervailing public interest in proceeding on schedule." *Id.* (cleaned up).[9]

Douglas had a contentious relationship with his court-appointed attorney, Harry Harmon, Jr., and before trial, Douglas repeatedly changed his mind as to whether Harmon could represent him.[10] Throughout proceedings, he accused Harmon of collaborating with

---

[9] Douglas relies on *United States v. Gallop*, 838 F.2d 105 (4th Cir. 1998), for the proposition that the district court should have considered: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the conflict between the defendant and his attorney; and (3) the extent of the breakdown in communication. *Id.* at 107. But the *Gallop* factors contemplate situations where a represented defendant seeks to replace his court-appointed attorney due to a collapse of the attorney-client relationship. Those factors do not apply when a *pro se* defendant seeks to reassert his right to counsel.

[10] Harmon was not the first attorney with whom Douglas had a difficult relationship. The court appointed Anthony M. Gantous to represent Douglas at his initial appearance in (Continued)

27

the prosecution, withholding discovery, and refusing to file meritorious motions. He twice asked to proceed pro se, before withdrawing these requests and informing the court that he was satisfied with Harmon's representation. But one month before trial, he filed a third motion to proceed *pro se*, and the district court granted that motion in part — appointing Harmon as standby counsel, subject to the following limitations:

> Mr. Harmon is not to give advice to Defendant concerning the significance of any of the evidence, is not to give advice regarding legal strategy, and should not perform any research on behalf of Defendant. Should defendant wish for his stand-by counsel to take a larger role in his defense, Defendant may submit a motion requesting to have Mr. Harmon re-appointed and agreeing to relinquish his *pro se* status. But Defendant cannot have it both ways, nor can Defendant utilize his election to proceed *pro se* as a means to delay trial regardless of whether he proceeds to trial *pro se* or submits a request asking that Mr. Harmon be re-appointed.

On October 20, 2019, following three days of jury selection and on the Saturday before opening statements, Douglas moved to relinquish his *pro se* status and reappoint Harmon, asserting that he had reviewed discovery and reevaluated his options. The district court denied this motion, observing that it had been filed on the eve of trial, and that it would place Harmon in an "untenable position."

In so ruling, the court did not abuse its discretion. We have recognized that judges have wide latitude to deny a late-breaking motion for substitution of counsel. *See United States v. McQueen*, 445 F.3d 757, 761 (4th Cir. 2006); *United States v. Corporan-Cuevas*, 35 F.3d 953, 956 (4th Cir. 1994) ("[A] motion . . . on the first day of trial . . . would clearly be untimely under all but the most exigent circumstances"). Such last-minute motions

---

May 2018. In October 2018, Douglas filed a motion to substitute counsel, and the court granted this motion, appointing Harmon in Gantous' stead.

place considerable strain on the ability of court and counsel to prepare for trial, and seriously undermine the public's "interest in proceeding on schedule." *Cohen*, 888 F.3d at 681 (cleaned up). As we explained in *United States v. West*:

> A criminal defendant has a constitutional right to defend himself; and with rights come responsibilities. If at the last minute he gets cold feet and wants a lawyer to defend him he runs the risk that the judge will hold him to his original decision in order to avoid [a] disruption of the court's schedule [by] a continuance granted on the very day that trial is scheduled to begin[.]

877 F.2d 281, 286 (4th Cir. 1981) (quoting *United States v. Solina*, 733 F.2d 1208, 1211–12 (7th Cir. 1984)). Here, the trial court did not abuse its discretion in denying Douglas's motion, filed as it was on the eve of opening statements. Indeed, when the court allowed Douglas to proceed *pro se*, it warned him about such last-minute requests precisely because of the potential for delays.[11]

Douglas argues that Harmon was prepared to step in, and that the court's refusal of his request defeats the purpose of appointing standby counsel. But a *pro se* defendant has no Sixth Amendment right to standby counsel or hybrid representation, and district courts have broad discretion to decide how much assistance, if any, standby counsel may provide. *United States v. Beckton*, 740 F.3d 303, 307 (4th Cir. 2014); *see also McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) ("A defendant does not have a constitutional right to choreograph

---

[11] Although the court cited hardship to Harmon, the substance of the district court's discussion focused on the last-minute nature of this motion. The court cited *United States v. Corporan-Cuevas*, 35 F.3d 953 (4th Cir. 1994), as authority for its denial of the motion, discussing the effects that a motion filed "on the first day of trial" would have on "the countervailing state interest in proceeding with prosecutions on an orderly and expeditious basis." *Id.* at 956. Those effects are obvious. Bringing counsel up to speed, and allocating time to prepare, would create a high possibility for delay.

special appearances by counsel."). Once Douglas relinquished his right to counsel, that right was no longer absolute, and the court had discretion to decide what level of assistance Harmon could provide in his capacity as standby counsel. The court did not abuse that discretion by declining to expand Harmon's role at the eleventh hour.[12]

V.

Next, Defendants Nixon, Taybron, Richardson, and Palmer appeal the denial of their motions for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, arguing that the Government failed to offer sufficient evidence to support their convictions. "We review the denial of a motion for judgment of acquittal de novo." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018).

On a defendant's motion, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant challenging the sufficiency of the evidence bears a "heavy burden" to overturn his conviction. *United States v. Clarke*, 842 F.3d 288, 297 (4th Cir. 2016). That is because all reasonable inferences are drawn in favor of the prosecution, *United States v. Hicks*, 64 F.4th 546, 550 (4th Cir. 2023), with the presumption that the jury resolved all evidentiary conflicts in the Government's favor, *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir.

---

[12] We also note that Douglas was not left entirely without assistance during the trial. Throughout proceedings, counsel for Douglas's co-defendants filed motions on behalf of all seven defendants, often addressing the most pressing issues in the case. *See, e.g.*, *James v. Harrison*, 389 F.3d 450, 456 (4th Cir. 2004) (discussing situation in which "counsel for co-defendants were present and generally protected the defendant's interests" (citing *United States v. Jackson*, 207 F.3d 953 (2000))).

2018).  Thus, we will not disturb the verdict if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## A.

Eric Nixon and Ryan Taybron contend they were entitled to a judgment of acquittal on charges of attempted murder and § 924(c) counts arising from two shootings that took place in early 2017.  As discussed above, "there are two essential elements to an attempted murder prosecution under Virginia law: (1) a 'specific intent to kill the victim'; and (2) some overt act in furtherance of that intent."  *Simmons*, 11 F.4th at 271 (quoting *Herring*, 758 S.E.2d at 235).  Nixon challenges the denial of his individual motion by arguing that the Government offered insufficient evidence for a jury to find he shot Darrell Pittman.  Taybron and Nixon contest the denial of their joint motion by arguing that the Government produced insufficient evidence of their intent to kill during a shootout with the Chestnut Gang.  Both arguments fail.

## 1.

We begin with Eric Nixon's individual argument.  Counts 23 and 24 charged Nixon with attempting to murder Darrell Pittman, of the Newsome Park Gang, on February 26, 2017.  Early that day, a member of the Bang Squad shot Pittman in the head while he was leaving the Aqueduct apartments in Newport News, Virginia.  Pittman survived, and was transported to a hospital, where he informed police officers that he'd been shot by "Nix from 3-6" regarding an "old beef."  Acting on this information, officers arrested Nixon and

31

Green at a Day's Inn in Hampton, Virginia, with a Glock 23 handgun in their possession. That firearm matched eleven shell casings retrieved from the scene of the shooting, and Shaquone Mercer testified she had purchased the handgun for Nixon three weeks earlier, at his instructions.

At trial, the defense called Pittman, who denied saying that Nixon had shot him and identified two other individuals as the shooters. But ballistics evidence connected Nixon to the shooting, and four witnesses testified that he was responsible. Newport News police officer Eric Nunez confirmed that Pittman had identified Nixon while he was in the hospital on the day of the shooting. In addition, Ford, Green, and Sweetenburg all testified that Nixon told them he shot Pittman — Nixon told Ford that "he caught [Pittman] coming out of Aqueduct"; told Sweetenburg that he'd shot Pittman in the head; and told Green that Pittman "flopp[ed] like a fish." This evidence, viewed in the Government's favor, is more than enough for a jury to find that Nixon shot Pittman.

Nixon argues that Pittman was the sole eyewitness to the shooting, and that it would be irrational for the jury to convict Nixon following Pittman's testimony. Of course, "[a] jury is entitled to make only reasonable inferences from the evidence," *United States v. Samad*, 754 F.2d 1091, 1097 (4th Cir. 1984) (cleaned up), but "it is the jury's province to weigh the credibility of the witnesses, and to resolve any conflicts in the evidence." *United States v. Dinkins*, 691 F.3d 358, 387 (4th Cir. 2012). Moreover, on appeal, we "assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Robinson*, 55 F.4th 390 (4th Cir. 2022) (cleaned up). The jury was not required to accept Pittman's recantation — or to discount the volume of evidence that Nixon was the shooter.

32

The testimony by Nunez, Mercer, Ford, Green, and Sweetenburg, and the forensic evidence connecting Nixon's firearm to the crime scene, gave the jury ample reason to credit Pittman's statements on the day of the shooting over his conflicting trial testimony.

2.

Nixon and Taybron's joint argument fares no better. Count 21 charged these two defendants with attempted murder in relation to the January 2, 2017, shootout with several members of the rival Chestnut Gang. The Government relied largely on Ford's testimony to establish a narrative of the encounter. According to Ford, while he was driving Taybron and Nixon through Chestnut Gang territory, Taybron spotted Chestnut Gang members outside a convenience store, and instructed Ford to pull over. They parked around a corner, and the defendants told Ford to give Taybron his gun. Taybron and Nixon approached on foot, and began "jawing" at the rival gang members for about five minutes. Ford grew concerned that Taybron and Nixon were "taking too long to shoot," so he got out of the vehicle to retrieve his firearm. As Ford approached, one of the Chestnut gangsters fired a shot, and Taybron and Nixon returned fire, emptying the clips in their guns before retreating to the car.

Taybron and Nixon argue that Ford's testimony is insufficient to show they intended to kill anyone during this incident. They argue that the shootout was a chance encounter, and that it does not resemble the Bang Squad's systematic hunts for rival gang members. They also insist it would be irrational to infer that they intended to shoot, because they approached outnumbered, spoke to their rivals for five minutes, and fired only when fired upon. But the weight of the evidence is committed to the jury. *See, e.g.*, *United States v.*

*Wysinger*, 64 F.4th 207, 211 (4th Cir. 2023); *United States v. Dennis*, 19 F.4th 656, 670 (4th Cir. 2021).  Our responsibility is only to determine whether there is enough evidence to sustain the jury's verdict — not to substitute our judgment for that of the factfinder, and decide for ourselves whether the jury got it right.  *See, e.g.*, *Savage*, 885 F.3d at 219 (explaining that we will uphold a jury verdict so long as it is supported by "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt" (cleaned up)).

Ford's testimony provided abundant evidence for a jury to conclude that Taybron and Nixon wanted to kill the members of the Chestnut Gang, even if the shootout initially began as a chance encounter.  The record contained ample evidence that the Bang Squad regularly provoked its rivals by taunting them and venturing into their territory.  Although Ford's narrative suggests that Taybron and Nixon did not set out to go "op shopping" — to hunt opposing gang members — the jury could reasonably have concluded that Taybron and Nixon made the decision to kill their adversaries when they spotted them during the drive.  And while the tactics employed by Taybron and Nixon could suggest that they intended merely to confront their rivals, not to kill them, the jury did not need to draw that inference.  *See Wysinger*, 64 F.4th at 211 ("[I]f the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." (quoting *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997))).

34

B.

Deshaun Richardson and Raymond Palmer challenge their convictions on Count 1, charging them with conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d). To prove a RICO conspiracy, the Government must show: (1) "that an enterprise affecting interstate commerce existed"; (2) "that each defendant knowingly and intentionally agreed" to conduct or participate in its affairs; and (3) "that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *Mathis*, 932 F.3d at 258 (cleaned up). Richardson and Palmer contend that the Government offered insufficient evidence for the jury to find that they agreed to the commission of at least two racketeering acts. Their arguments fail.

1.

We begin with Deshaun Richardson. In addition to the RICO conspiracy at issue in Count 1, the Government charged Richardson with four counts arising from the April 6, 2015, murders of Domingo Davis and Jada Richardson (Counts 6–9). Forensic expert Juliana Red Leaf opined that a handgun Richardson carried on the day of the double murders matched bullets and shell casings recovered from the crime scene. In addition, four cooperating Bang Squad members testified at trial, and tied Richardson to the murders: Corey Sweetenburg testified that Richardson, Hunt, Green, and Harris left the Marshall Courts apartments before the murders to hunt for Davis; Racquille Jackson recounted that the quartet convened at his mother's house to lie low, and told him about the shootings; and Jarrell Atkins and Jamaree Green each claimed that Richardson was one of the gunmen.

35

Finally, one hour after the murders, Richardson sent Hunt a message urging him to delete social media posts that referred to "busting" his "opp[s]."

On this evidence, the jury convicted Richardson on Count 1, the RICO conspiracy. But it acquitted Richardson on Counts 6 through 9, which charged him with the double murders. Richardson maintains that the Government presented an "all-or-nothing" theory of the case — either he was the fourth shooter, or he was not involved. Because the jury rejected that theory, and made a finding that he did not aid or abet the killings, Richardson contends that there is insufficient evidence of his involvement in the conspiracy to sustain a conviction on Count 1.

This argument boils down to the notion that a conviction on the RICO conspiracy charge is incompatible with an acquittal on the predicate murder counts. But "[a] defendant cannot challenge his conviction merely because it is inconsistent with a jury's verdict of acquittal on another count." *United States v. Legins*, 34 F.4th 304, 316 (4th Cir. 2022) (cleaned up); *United States v. Louthian*, 756 F.3d 295, 305 (4th Cir. 2014); *Wiggins v. Boyette*, 635 F.3d 116, 127 (4th Cir. 2011). After all, "an inconsistent verdict can result from mistake, compromise, or lenity, and a jury could just as likely err in acquitting as convicting." *Legins*, 34 F.4th at 316 (cleaned up). Because a court cannot divine the jury's intentions, "a reviewing court's assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations." *Id.* at 316 (cleaned up). Courts rarely tread such treacherous waters.

Accordingly, the mere fact that Richardson was acquitted on the counts arising from the Davis/Richardson murders does not undermine his conviction of the RICO conspiracy.

36

*See United States v. Tinsley*, 800 F.2d 448, 450–52 (4th Cir. 1986) (holding that an acquittal on one of two charged racketeering acts did not invalidate convictions for substantive racketeering, and for racketeering conspiracy); *see also United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020). Innumerable factors may have led to this split decision. The jury may have found that Richardson agreed to the murders, but played no role in carrying them out. It may have discounted Sweetenburg's claim that Richardson was one of the four who left Marshall Courts that morning. Or it may have found the forensic evidence too uncertain to reach a conviction beyond a reasonable doubt. Whatever the reason may be, we will not "reverse engineer the jury's thought processes," and speculate as to why the jury reached the outcome it did. *See Campbell v. Boston Sci. Corp.*, 882 F.3d 70, 75 (4th Cir. 2018).

Richardson also argues that the Government offered no evidence that he committed any racketeering acts himself. This argument is a nonstarter. We have recognized that "a defendant can conspire to violate RICO . . . without 'himself commit[ing] or agree[ing] to commit the two or more' acts of racketeering activity." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (quoting *Salinas v. United States*, 522 U.S. 52, 62 (1997)).[13] It is enough that the defendant "adopt the goal of furthering or facilitating the criminal

---

[13] As our sister circuits have noted, the RICO conspiracy statute is designed to reach "an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *See, e.g.*, *United States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011) (quoting *Salinas*, 522 U.S. at 65). If the Government was required to prove that a defendant committed specific racketeering acts to obtain a conviction for a RICO conspiracy, "Section 1962(d) would . . . become a nullity," as it would require the same proof as a substantive RICO offense. *See United States v. Glecier*, 923 F.2d 496, 501 (7th Cir. 1991).

endeavor," *Simmons*, 11 F.4th at 255 (quoting *Salinas*, 522 U.S. at 65), by agreeing "that a member of the enterprise would perform at least two racketeering acts," *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017).

There was ample evidence for the jury to find Richardson agreed to the commission of multiple murders and attempted murders, even if he did not personally commit them. As discussed above, Atkins, Green, Sweetenburg, and Jackson testified as to Richardson's participation in discussions about the double murders. Moreover, Richardson's social media activity, including his admonition to Hunt to delete his status one hour after the murders, and his message in a group chat asking other gang members why they didn't "pop Dwayne [Dozier]," permits an inference of broad involvement in the Bang Squad's efforts to hunt and kill its rivals. Accordingly, "the jury's verdict is not necessarily inconsistent." *Legins*, 34 F.4th at 316. Even if Richardson did not commit any of these shootings himself, the jury could reasonably find he participated in the conversations around these offenses, and agreed that they would be carried out.[14]

## 2.

The Government produced no direct evidence that Palmer agreed to the commission of two racketeering acts. But the prosecution offered circumstantial evidence that he did so. *See United States v. Tillmon*, 954 F.3d 628, 640 (4th Cir. 2019) ("Due to the clandestine nature of a conspiracy, the offense is often proved by circumstantial evidence and the

---

[14] Moreover, the Government presented evidence at trial connecting Richardson to various robberies and drug offenses. While the Government dismissed Richardson from the related counts before the prosecution submitted its case, the underlying evidence may still be relied on to support a RICO conspiracy conviction. *See Tinsley*, 800 F.2d at 450.

context in which circumstantial evidence is adduced."). Witnesses testified that Palmer sold marijuana in the Bang Squad's territory, retrieved a firearm to protect Jarrell Atkins from an investigation, and took part in the midnight shooting of Dwayne Dozier's home. In sum, Palmer protected the Bang Squad, sold drugs in the gang's territory, and retaliated against its foes.

Palmer argues that the Dozier shooting cannot be a valid predicate, as it was charged only as an armed assault rather than an attempted murder, and that his marijuana sales have no connection to the gang. We are not persuaded. Because a racketeering conspiracy is not contingent on specific predicates, the Government's decision to charge the Dozier home shooting as an armed assault is irrelevant. *See United States v. Barronette*, 46 F.4th 177, 207 (4th Cir. 2022) (holding that the Government need not charge specific predicates); *Tinsley*, 800 F.2d at 450 (holding that a jury may convict on a RICO conspiracy charge while acquitting on predicate acts). And because Palmer was a member of the Bang Squad, and the Government offered testimony that the Bang Squad confronted, fought, or shot others who sold drugs in its territory, the jury could infer that Palmer's drug sales were gang activity, or that they were carried out with its approval. *See United States v. Marino*, 277 F.3d 11, 27 (1st Cir. 2002) ("A sufficient nexus or relationship exists between the racketeering acts and the enterprise if the defendant was able to commit the predicate acts by means of . . . his association with the enterprise.").

Moreover, the Government need not identify the specific racketeering acts that the defendant agreed would be committed. *United States v. Cornell,* 780 F.3d 616, 625 (4th Cir. 2015). "[T]he object of a RICO conspiracy is 'to engage in racketeering,' not to

commit each predicate racketeering act." *United States v. Gutierrez*, 963 F.3d 320, 343 (4th Cir. 2020) (quoting *United States v. Garcia*, 754 F.3d 460, 482 (7th Cir. 2014)). Thus, the Government need only prove that the defendant "agree[d] to pursue the same criminal objective as that of the enterprise," *Mathis*, 932 F.3d at 260, by establishing "the types of racketeering acts that members of the conspiracy agreed to commit," *Cornell,* 780 F.3d at 625. The evidence against Palmer is clear on that count. Even if the foregoing incidents are not valid racketeering predicates, they are circumstantial evidence that Palmer assented to the Bang Squad's essential racketeering conduct: murder. Palmer's participation in one retaliatory shooting, and his retrieval of a firearm following another, constitutes evidence that he knew the gang used murder to exert its influence and protect its territory, and that he agreed to advance its violent objectives.

## VI.

Because the Chestnut Gang members fired first in the shootout on January 2, 2017, Taybron and Nixon sought a jury instruction on self-defense, and the court provided one. But while the defendants requested a *justifiable* self-defense instruction, the court instead instructed the jury only on a theory of *excusable* self-defense. We review the district court's refusal to give a jury instruction for abuse of discretion. *United States v. Hassler*, 992 F.3d 243, 246 (4th Cir. 2021). Given that the undisputed facts preclude a theory of justifiable self-defense, we affirm.

"Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault ('justifiable self-defense') and self-defense with fault ('excusable

40

self-defense')." *Bell v. Commonwealth*, 788 S.E.2d 272, 275 (Va. 2016); *Osman v. Osman*, 737 S.E.2d 876, 880 (Va. 2013); *Yarborough v. Commonwealth*, 234 S.E.2d 286, 289 (Va. 1993). An act of self-defense is *justifiable* if the defendant acted "without any fault on his part in provoking or bringing on the difficulty." *Osman*, 737 S.E.2d at 880 (cleaned up). Self-defense is merely *excusable* if the defendant bore "some fault" in bringing about the encounter. *Id.* The practical impact of these theories lies in the duty to retreat: A defendant who is at fault in the encounter must retreat "as far as possible" and "announce[] his desire for peace" before using force in his defense, while a defendant without fault need not do so. *Bell*, 788 S.E.2d at 276 (cleaned up). Because Taybron and Nixon returned fire before retreating to Ford's car, they argue that the district court's decision to instruct the jury only on excusable self-defense, and not justifiable self-defense, prejudiced their case.

But the Supreme Court of Virginia has clearly held that where "a defendant is even slightly at fault, the killing is not justifiable homicide." *Avent v. Commonwealth*, 688 S.E.2d 244, 259 (Va. 2010) (quoting *Perricillia v. Commonwealth*, 326 S.E.2d 679, 685 (Va. 1985)). In *Avent*, the victim attacked the defendant first — knocking him to the ground and choking him — but broke off the encounter and retreated upstairs. *Id.* at 249, 259. Concerned that the victim was retrieving a firearm, the defendant followed him, carrying a shotgun. *Id.* Upstairs, the victim assaulted the defendant with a wooden board, and the defendant shot him, knocked him over, and bludgeoned him, causing his death. *Id.* The defendant was convicted of murder, and the Supreme Court of Virginia affirmed. *Id.* While the victim was the aggressor in the fatal encounter, the court held that the defendant

41

"was not entitled to a justifiable homicide jury instruction due to his fault in bringing on the difficulty by pursuing [the victim] upstairs." *Id.* at 259.

*Avent* indicates that any degree of fault on the part of the defendant, even the act of following the victim after a heated altercation, precludes a claim of justifiable self-defense. *Smith v. Commonwealth*, 435 S.E.2d 414, 416 (Va. 1993) ("Any form of conduct by the accused from which the fact finder may reasonably infer that the accused contributed to the affray constitutes fault." (cleaned up)).[15]   Taybron and Nixon did much more than that: They armed themselves, confronted a rival gang in hostile territory, and kicked off a five-minute shouting match that ended in gunfire.  On these facts, it would be impossible for a jury to conclude that Taybron and Nixon are not at least "slightly at fault" in the encounter. *Avent*, 688 S.E.2d at 259.

Citing *Jones v. Commonwealth*, Taybron and Nixon argue that words alone cannot establish provocation.  *See* 833 S.E.2d 918, 930 (Va. Ct. App. 2019).  But this rule pertains to the provocation element of *manslaughter* — not to the question of whether a defendant bears no fault in causing a confrontation, as required for a claim of justifiable self-defense. To reduce a homicide to manslaughter, the defendant must show that he killed "in the heat of passion and [upon] reasonable provocation," referring to a state of rage or fear "which renders a person deaf to the voice of reason." *Washington v. Commonwealth*, 878 S.E.2d

---

[15] In certain cases, it may be necessary for the trial court to issue both instructions, reserving the question of fault for the factfinder. *See, e.g.*, *Bell*, 788 S.E.2d at 276 (holding that the trial court erred in issuing only an excusable self-defense instruction, and not a justifiable self-defense instruction, where witnesses testified that the victim approached the defendant, pulled out a gun, and made a hostile remark).  But because the critical facts are undisputed here, the district court was not required to do so.

430, 436 (Va. Ct. App. 2022) (cleaned up). That concept has no relation to whether the defendant bears "any fault" in contributing to a fatal encounter, an inquiry that resembles causation. *See Osman*, 737 S.E.2d at 880; *Smith*, 435 S.E.2d at 416. While "[w]ords alone are never sufficient reasonable provocation" to reduce a homicide to manslaughter, *Jones*, 833 S.E.2d at 926, words can certainly contribute to the lethal escalation of an encounter. *Cf. Washington*, 878 S.E.2d at 435 (affirming denial of justifiable self-defense instruction where appellant approached the victim, started a heated verbal exchange, and shot the victim at its climax).[16]

## VII.

Richardson argues that the court erroneously enhanced his sentence under Count 1 based on the murders of Domingo Davis and Jada Richardson. "On a challenge to a district court's application of the Guidelines, we review questions of law de novo and findings of fact for clear error." *United States v. Allen*, 909 F.3d 671, 677 (4th Cir. 2018) (cleaned up). A factual finding is clearly erroneous if, upon reviewing the entire record, we are "left with

---

[16] Defendants further cite *Jordan v. Commonwealth* for the proposition that "insults and threats" are never a "provocative act." 252 S.E.2d 323, 325 (Va. 1979). This argument misstates *Jordan*'s holding. In Virginia, a defendant cannot claim self-defense unless the victim engaged in "some overt act indicative of imminent danger." *Commonwealth v. Cary*, 623 S.E.2d 906, 912 (Va. 2006) (cleaned up). In *Jordan*, the Supreme Court of Virginia held that a victim's "words and threats" could not constitute such an "overt act . . . that would justify a plea of self-defense." 252 S.E.2d at 325. While a defendant cannot claim self-defense based solely on a *victim's* threatening words, that principle is irrelevant in determining whether the *defendant* bears some fault in contributing to a dangerous encounter.

the definite and firm conviction that a mistake has been committed." *United States v. Barnett*, 48 F.4th 216, 220 (4th Cir. 2022) (cleaned up).

The court calculated Richardson's base offense level by applying U.S.S.G. § 2E1.1, which governs racketeering convictions. That provision sets the offense level at the greater of 19 or the base offense level of the predicate racketeering activity — in this case, murder. U.S.S.G. § 2E1.1(a). The district court relied on the latter, raising Richardson's base offense level to 43, the maximum permitted by the United States Sentencing Guidelines, after applying a cross-reference to U.S.S.G. § 2A1.1(a), which governs first degree murder. *See* U.S.S.G. § 2A1.1 cmt. 1 (permitting this cross-reference "in cases in which the offense level . . . is calculated using the underlying crime (e.g., murder in aid of racketeering)"). Coupled with Richardson's criminal history category of V, this calculation yielded a guidelines range of 240 months' imprisonment. Acknowledging Richardson's lack of personal involvement in the Bang Squad shootings, the court sentenced him to 204 months, 36 months below the guidelines range.

Richardson maintains that the cross-reference to U.S.S.G. § 2A1.1 was clear error, because the jury acquitted him of the Domingo Davis and Jada Richardson murders. As an initial matter, it is firmly established that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge[s], so long as that conduct has been proven by a preponderance of the evidence." *United States v. Medley*, 34 F.4th 326, 335 (4th Cir. 2022) (quoting *United States v. Watts*, 519 U.S. 148, 157 (1997)). After all, because the Sentencing Guidelines are advisory, the sentencing judge "could disregard the Guidelines and apply the same sentence," provided he does not

44

exceed the statutory maximum applicable to the offense of conviction. *Id.* at 336 (quoting *United States v. Grubbs*, 585 F.3d 793, 799 (4th Cir. 2009)).

But in any event, the district court did not find that Richardson committed the double murders. At sentencing, the Government argued he was liable for the Davis/Richardson murders on a theory of personal liability. *See* U.S.S.G. § 1B1.3(a)(1)(A) (instructing sentencing court to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"). But the district court instead found Richardson was responsible for the murders on a theory of *conspirator* liability, focusing on his conversations with the shooters before and after the murders. *See* U.S.S.G. § 1B1.3(a)(1)(B) (directing court to consider foreseeable acts of co-conspirators committed within the scope of a conspiracy, and in furtherance of that conspiracy). That finding is not erroneous, much less clearly so. The Government charged the Davis and Richardson murders as VICAR murders precisely because they were carried out as part of the Bang Squad's systematic efforts to hunt and kill its rivals, and fell within the scope of its racketeering conspiracy.

Richardson further argues that the jury's special verdict precludes a sentencing finding based on conspirator liability. We have referenced a "non-contradiction principle which prohibits the district court from finding facts by a preponderance of the evidence that contravene the jury's finding beyond a reasonable doubt." *United States v. Mitchell*, 493 F. App'x 440, 441–42 (4th Cir. 2012) (citing *United States v. Curry*, 461 F.3d 452, 460–61 (4th Cir. 2006)). Assuming without deciding that this principle remains good

45

law,[17] it is not implicated here. On the verdict form for Count 1, the jury found Richardson had not "committed, or aided, abetted, counseled, commanded, induced or procured" the Domingo Davis and Jada Richardson murders. JA 6725–27. This language tracks with U.S.S.G. § 1B1.3(a)(1)(A), and contemplates only personal or accomplice liability. It does not conflict with the sentencing court's findings pursuant to U.S.S.G. § 1B1.3(a)(1)(B), which relied exclusively on conspirator liability.

## VIII.

Finally, Defendants collectively argue that the district court abused its discretion by denying their motion for a mistrial, which they filed in response to a witness's comments about an uncharged murder. We review a district court's decision on a motion for mistrial for abuse of discretion, and we reverse only in "the most extraordinary of circumstances." *United States v. Recio*, 884 F.3d 230, 239 (4th Cir. 2018) (cleaned up). Circumstances are far from extraordinary here.

In our system of justice, "the law does not allow consideration of other crimes as evidence of a defendant's criminal disposition." *United States v. Foutz*, 540 F.2d 733, 736

---

[17] *Mitchell* is unpublished, and this issue has divided our sister circuits. *Compare United States v. Pimentel-Lopez*, 859 F.3d 1134, 1142 (9th Cir. 2016) (vacating sentence where judge's findings contradicted jury's special verdict), *with United States v. Webb*, 545 F.3d 673, 677 (8th Cir. 2008); *United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir. 2005); *United States v. Smith*, 308 F.3d 726, 745–46 (7th Cir. 2002) (permitting such contradiction).

(4th Cir. 1976); *see also* Fed. R. Evid. 404(b).[18]  But that does not mean that any reference to an uncharged offense, no matter how brief and attenuated it may be, compels a mistrial. Before granting a mistrial, "the district court should consider whether there are less drastic alternatives to a mistrial that will eliminate any prejudice." *United States v. Hayden*, 85 F.3d 153, 157 (4th Cir. 1996).  And because "we generally follow the presumption that the jury obeyed the limiting instructions of the district court," *United States v. Williams*, 461 F.3d 441, 451 (4th Cir. 2006) (cleaned up), "no prejudice exists if the jury could make individual guilt determinations by following the court's cautionary instructions," *United States v. Hart*, 91 F.4th 732, 745 (4th Cir. 2024) (cleaned up).

Accordingly, we have affirmed the denial of mistrial motions based on a witness's improper reference to an uncharged offense where the reference was brief, and the court promptly instructed the jury to disregard it.  *E.g.*, *United States v. Collins*, 372 F.3d 629, 634 (4th Cir. 2004); *United States v. Vogt*, 910 F.2d 1184, 1192–93 (4th Cir. 1990); *United States v. Morrow*, 731 F.2d 233, 235 n.4 (4th Cir. 1984).  Most recently, in *United States v. Zelaya*, a witness testified that the defendant "told her that she would cry for her son like she cried for 'Hugo,'" and that "Hugo was 'the guy [defendants] had killed before.'"  908 F.3d 920, 929–30 (4th Cir. 2018).  Because the defendants were not charged with the Hugo murder, defense counsel promptly moved for a mistrial.  *Id.*  The court denied this motion,

---

[18] Of course, exceptions exist for reliable evidence introduced for reasons other than character, provided it is necessary to prove the context or elements of the charged offense. *See United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011).  But because the Government did not invoke these exceptions below, we do not address them here.  *See* Fed. R. Evid. 404(b)(3) (requiring prosecution to provide notice of his intent to introduce such evidence).

and we affirmed, observing that the Government asked the witness nothing further about the Hugo murder; that the Hugo murder was not referenced again at trial; and that the court instructed the jury to disregard any uncharged offense. *Id.*

Such is the case here. On the thirteenth day of trial, during the Government's direct examination of Corey Sweetenburg, the prosecutor asked Sweetenburg why he had elected to cooperate with the investigation. Sweetenburg explained that he had decided to come forward when Nixon and Taybron were "locked up for the Ralph murder." Defendants immediately objected and requested a mistrial. After a bench colloquy and a brief recess, the court denied the mistrial motion, but sustained the objection, struck the objectionable testimony, and issued an extensive curative instruction:

> Now, there's one other matter that I wanted to address with you, and it is this: Just before, just before our lunch break, you heard the current witness, Corey Sweetenburg, who is sitting there on the stand, refer to the Ralph murder. I instruct you and I direct you that that testimony was improper, and you are to completely disregard that statement. Put it out of your mind.
>
> First, I remind you that none of the defendants in this case are charged with the Ralph murder.
>
> Second, there are no allegations in the charges before this court at all about any Ralph murder, and anything having to do with any so-called Ralph murder has absolutely nothing to do with the charges in this case. Therefore, I am ordering that testimony be stricken, and you are to totally disregard it in your consideration of the evidence in this case as to all the defendants, and you are to totally disregard it in your deliberations as to all the defendants. It shall not be discussed in any way during deliberations and shall not be part of your individual or collective decision-making process.

Thereafter, the court dissuaded the Government from introducing exhibits that referenced the Ralph murder, including rap videos and a Facebook post. Throughout the remaining three weeks of trial, not a single witness made any additional reference to the Ralph murder.

48

In providing this thorough and careful instruction, the district court did not abuse its discretion. Quite like the comment at issue in *Zelaya*, Sweetenburg's reference to "the Ralph Murder" was brief, ambiguous, and not repeated. The prosecution did not intentionally elicit this comment. Nor did it reference or allude to the Ralph murder at any point throughout the remainder of the proceedings. And there is no question that the jury, if it followed the court's extensive instruction, could make its own determination as to each defendant's guilt or innocence of the crimes charged. Accordingly, the court did not abuse its discretion by declining to order a mistrial — to cast aside an exhaustive, five-week proceeding — in response to Sweetenburg's stray remark.

## IX.

For the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED*

49